# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BILLY GENE NORRIS,

      Plaintiff,

                    Case No. 19-cv-10782
    -vs-            Hon. Terrence G. Berg
                    Mag. Judge Stephanie Dawkins Davis

CHIEF JADIE R. SETTLES;
OFFICER A. HATHORN;
OFFICER CHRISTOPHER REYNA;
OFFICER JASON ORME;
DETECTIVE C. HARKINS;
CITY OF ROMULUS, a political
subdivision of the State
of Michigan,

      Defendants.
                    /


The Deposition of BILLY GENE NORRIS, II, taken for purposes
of discovery in the above-entitled matter before Susan L.
Marek, CSR-2692, Notary Public and Certified Shorthand
Reporter in and for the County of Wayne (Acting in the
County of Oakland), State of Michigan, at 26700 Lahser
Road, Suite 400, Southfield, Michigan, on Monday,
August 26, 2019, commencing at 8:40 a.m.


APPEARANCES:

                      MARTIN E. RADNER (P79894)
                      Excolo Law, PLLC
                      26700 Lahser Road, Suite 400
                      Southfield, Michigan  48033
                      (248) 291-9712

                          Appearing on behalf of Plaintiff.

                      AUDREY J. FORBUSH (P41744)
                      Plunkett Cooney
                      Plaza One Financial Center
                      111 East Court Street, Suite 1B
                      Flint, Michigan  48502
                      (810) 342-7014
                        Appearing on behalf of Defendants.

ALSO PRESENT:    Captain Derran Shelby
                  Officer Christopher Reyna

Page 2

1                    I N D E X

2   WITNESS:                                          PAGE

3        BILLY GENE NORRIS, II

4            Examination          Ms.  Forbush          3

5            Examination          Mr.  Radner          94

6

7

8

9

10

11

12

13                  E X H I B I T S

14   NO.                                            MARKED

15   1    Photograph                                     3

16   2    Photograph                                     3

17   3    Photograph                                     3

18   4    Photograph                                     3

19   5    Photograph                                     3

20   6    Photograph                                     3

21   7    Plaintiff's Response to Defendants' First Set

22        of Interrogatories and Requests for Production

23        of Documents                                   3

24

25

Page 3

1                                    Southfield, Michigan

2                                    Monday, August 26, 2019

3                                    At about 8:40 a.m.

4                          - - -

5                    BILLY GENE NORRIS, II,

6          after having been first duly sworn by the Notary

7          Public to tell the truth, the whole truth and nothing

8          but the truth, was examined and testified on his oath

9          as follows:

10                         (Exhibits Nos. 1 through 7 were

11                         marked for identification.)

12                         MS. FORBUSH:  Let the record reflect

13         that this is the deposition of Billy Gene Norris, II,

14         taken pursuant to Notice and in accordance with the

15         Federal Rules of Civil Procedure, to be used for all

16         purposes contemplated by those rules.

17                         EXAMINATION

18    BY MS. FORBUSH:

19    Q    Sir, can you state your full name for the record?

20    A    Billy Gene Norris, II.

21    Q    All right.  And, Mr. Norris, what's your date of

22         birth?

23    A    I was told it's 07-19-1965.

24    Q    Are you in doubt of your date of birth or --

25    A    Well, it's second-hand knowledge, I mean.

1    Q    Do you have a birth certificate?

2    A    I don't have one on me, no.

3    Q    Well, have you ever looked at your birth certificate?

4    A    Yes, I have.

5    Q    Would you have any reason to doubt that you were born

6         on July 19th, 1965?

7    A    No, I don't.

8    Q    How did you get to the deposition today?

9    A    I drove.

10   Q    By yourself or with someone?

11   A    My mom.  She's sitting out in the lobby here.

12   Q    And what's your mom's name?

13   A    Gloria.

14   Q    What's Gloria's last name?

15   A    Needham.

16   Q    Can you spell it, please?

17   A    N-e-e-d-h-a-m.

18   Q    And where do you currently reside?

19   A    At 36840 Chase, Romulus, Michigan 48174.

20   Q    How long have you lived there?

21   A    About three years now.

22   Q    And do you live with anyone?

23   A    My mom and my stepfather.

24   Q    And what's your stepfather's name?

25   A    James Needham.

1   Q   Does anyone else live at the home?

2   A   No.

3   Q   Is this your mother's home or your stepfather's home?

4   A   My stepfather's home.

5   Q   All right.  Do you pay rent?

6   A   Well, I do chores for them and stuff.  My stepfather's

7       getting up there in age, and he's got a bit of a, I

8       don't know, dementia or whatever.  He comes and goes,

9       you know.  I've got to protect him kind of.  He wants

10      to go places, and he can't.

11  Q   All right.  And what kind of vehicle did you drive

12      yourself in here today?

13  A   2003 Honda Odyssey.

14  Q   What color is that?

15  A   White.

16  Q   And who is that registered to?

17  A   My mother, Gloria Needham.

18  Q   Do you own your own vehicle?

19  A   No.  I don't have -- well, I have a van, a 1979 van.

20      It's like a bread truck, UPS truck.

21  Q   Do you use that for work, or is that for transporta-

22      tion only?

23  A   No.  It's for storage right now.

24  Q   What do you store in there?

25  A   Some of my personal belongings, tools and stuff.

Page 6

1    Q    You've been deposed before, correct?

2    A    Yep, by you.

3    Q    Yep.  Well, you've given more than one dep, haven't

4         you?

5    A    Well, yeah, yeah.  I have for accidents and stuff like

6         that.

7    Q    All right.  And you understand that if at any time you

8         don't understand my question or would like me repeat

9         it or rephrase it, I'd be happy to do so; otherwise,

10        if you answer the question, I'm going to assume you're

11        answering it truthfully, correct?

12   A    Correct.

13   Q    If you need to take a break at any time, just let me

14        know.  I'm happy to do that.  All I ask is that if a

15        question is pending, that you answer that question,

16        fair?

17   A    Okay.

18   Q    All right.  So, how many lawsuits have been filed on

19        your behalf that you're aware of?

20   A    You mean total?

21   Q    Yeah.

22   A    Probably four that I can think of.

23   Q    When was the first one?

24   A    Whew.  I can't even think of what year it was.  It was

25        a product liability.  Epil-Stop, it burned my face.

1   Q    I'm sorry.  What was that?

2   A    Epil-Stop.  It's a hair depilatory and, you know, it's

3          supposed to cut down on your shaving or whatever.

4   Q    How long ago was that?

5   A    Oh, gosh.  1999 maybe.

6   Q    And what happened with that lawsuit?

7   A    It settled.

8   Q    For how much?

9   A    Six thousand.

10   Q    And then when was your next lawsuit?

11   A    I think it was my shoulder, my car accident.

12   Q    And when was that?

13   A    2009.

14   Q    And what was the result of that lawsuit?

15   A    What do you mean, settlement?

16   Q    Yeah.  It settled?

17   A    Yeah, for like 98,000.

18   Q    All right.  And then your next lawsuit?

19   A    I believe it would be Turner.

20   Q    When you say that, Derek Turner?

21   A    Yep.

22   Q    And that one also settled, correct?

23   A    Yep.

24   Q    And how about your fourth lawsuit, is it this one?

25   A    That would be this one, wouldn't it?  I think.

1    Q    Any other lawsuits that you recall?

2    A    Nothing that I can think of right now, no.

3    Q    All right.  And in the car accident, --

4    A    Uh-huh.

5    Q    -- what type of injuries did you sustain?

6    A    Partially detached bicep tendon.

7    Q    What arm?

8    A    My right arm.

9    Q    Any other injuries?

10   A    My neck and my back.

11   Q    As a result of the incident that we're here on today

12        have you sought any medical treatment?

13   A    I went to the hospital that night, but I wasn't

14        getting any -- you know, I was just sitting there

15        waiting and waiting and waiting and, you know, nobody

16        came in, so I ended up leaving.  But there was

17        bruising on the inside of my arm and stuff.  I have

18        pictures of it, which I didn't get until two days

19        later, because I didn't notice it until then.

20   Q    So, you went to which hospital?

21   A    Annapolis.  It's Beaumont.  It's Annapolis on Howe

22        Road, I think.

23   Q    And did you register as a patient there?

24   A    I signed in and everything, yes.  But, like I said, I

25        wasn't -- they weren't too worried about my, you know,

1    my problems at the time.  So, I was like waiting and
2    waiting and felt like I was just forgotten about, so I
3    ended up leaving.
4  Q  Did you go anywhere else for treatment?
5  A  No, I went home.
6  Q  And at any other time since then, and that would've
7    been --
8            Did you go to Beaumont on June 14th,
9    2018 or would it have been the next day?
10 A  No, it was that night I went, that night.
11 Q  All right.  Other than going on June 14th, 2018, did
12   you go anywhere else for treatment?
13 A  No.
14 Q  Are you claiming as you sit here today that you have
15   any physical injuries as a result of the incident on
16   June 14th?
17 A  No, I'm not, no.
18 Q  Have you had to seek any psychiatric, emotional
19   counseling, therapy as a result of the incident?
20 A  No, I have not.
21 Q  Do you have any plans to?
22 A  Not really.  I couldn't afford it if I wanted to, so I
23   just confide in friends.
24 Q  Who do you confide in?
25 A  Family members and friends.

1    Q    All right.  Give me their names.

2    A    Oh.  (Laughing.)  Give you their names?  People I've

3         talked to.  My mom.  Can't talk to my stepdad about

4         it.  My dad.

5    Q    What's your dad's name?

6    A    Billy Norris.

7    Q    Where does he live?

8    A    Hale, Michigan.

9    Q    How often do you see him?

10   A    Oh, couple times a year maybe.

11   Q    Do you talk regularly on the phone or --

12   A    No, un-uh.

13   Q    Who else do you confide in?

14   A    Whew.  My wife.

15   Q    What's her name?

16   A    Marsha.

17   Q    What's Marsha's last name?

18   A    Norris.

19   Q    And where does she live?

20   A    Ohio.  Jackson Center, Ohio.

21   Q    How long has she lived there?

22   A    Oh, probably five years.

23   Q    Are you divorced?

24   A    No.

25   Q    Separated?

1   A   Yeah, somewhat.

2   Q   When's the last time you and Marsha lived together as

3       husband and wife?

4   A   Oh, in -- whew.  I would have to say probably 2004,

5       something like that.  No, wait.  Say probably 2012.

6       I'm sorry.

7   Q   When were you married?

8   A   Well, August 26th.  I'm really not sure on the year.

9       I'm sorry.  It was the year of the blackout, when the

10      power went out.  I can't remember.  I'm sorry.

11  Q   Well, do you know how many years you've been married

12      approximately?

13  A   Whew.  No.  (Laughing.)  I couldn't think of it.

14  Q   More than 10?

15  A   Oh, yeah.

16  Q   Do you have any children?

17  A   Yes.

18  Q   How many?

19  A   One.

20  Q   Son?  Daughter?

21  A   My son.

22  Q   And his name?

23  A   Billy.

24  Q   III?

25  A   Yep.

Page 12

1    Q    And where does he live?

2    A    He lives with his mother.

3    Q    And how old is Billy?

4    A    He's 10.

5    Q    And how often do you see him?

6    A    As much as possible.

7    Q    What does that mean, once a year?

8    A    Oh, no.  It's every few months, if possible.  I mean,

9         as much as possible.

10                        Next week I plan on going down.

11   Q    Where do you stay when you go down there?

12   A    With them.

13   Q    Do you have plans to get a divorce or --

14   A    No.

15   Q    You're married, and you just don't live together?

16   A    No.  Situations came up, and we can't live together

17        right now.

18                        I think she has some psychological

19        issues and stuff.  It's like her mother died on her

20        birthday, and she's just not been able to get over it.

21        And the year prior to that her brother died, you know,

22        and she's just -- it's been a lot of weight on her

23        shoulders and stuff.

24                        And her family all moved to Ohio, so

25        she felt like she's abandoned or whatever, and then

1    she ended up -- they offered to help her out to come

2    down there and stay, so she did.

3    Q    So, who does she live with?

4    A    She lives with my son.

5    Q    Well, if she has these psychological issues, is she

6         okay to raise your son by herself?

7    A    Oh, yes.

8                        MR. RADNER:   I'll object.   This is

9         getting really irrelevant.

10   Q    (By Ms. Forbush):   Yes, you said?

11   A    What was the question?

12   Q    That she's capable of raising your son?

13   A    Oh, yes, most definitely.

14   Q    Anybody else you confide in?

15   A    No, not that I can think of.

16   Q    What have you done to prepare for your deposition

17        today, if anything?

18   A    Tried to get some rest.

19   Q    How much rest did you get?

20   A    Oh, I probably got about, I don't know, five hours of

21        sleep last night.

22   Q    Have you smoked any marijuana today?

23   A    No.

24   Q    When's the last time you did that?

25   A    Last night.

                                                      Page 14

1    Q    What time?

2    A    Oh, I don't know, 11 o'clock.

3    Q    Does that help you sleep?

4    A    Yes.

5    Q    Do you have a medical marijuana card or --

6    A    Yes.

7    Q    How long have you had that?

8    A    Oh, I don't know, years.  Since the beginning.

9    Q    What do you mean "since the beginning"?  I don't

10        understand.

11   A    Since they started issuing them.  Probably 2009.

12   Q    And you've had one continuously?

13   A    No.  It expired at some point in the past.

14   Q    Did you renew it?

15   A    Yes, I have.

16   Q    When did you renew it?

17   A    Just, whew -- I don't know.  Probably June.

18   Q    June of 2019?

19   A    Yeah.

20   Q    When did it expire?

21   A    Well, I'm not sure on the other one.

22   Q    Who did you go to see for the renewal of your medical

23        marijuana card?

24                    MR. RADNER:  I'll place an

25        objection.  All of this stuff is very irrelevant.

1          But go ahead and answer.

2   A    Right there in Romulus.   There's a doctor's office by

3          the city park there.

4   Q    (By Ms. Forbush):  Have you gone there just the one

5          time for the renewal?

6   A    Yeah.

7   Q    Who's your primary care physician?

8   A    Dr. -- shoot.  I can't think of his name.  I can't

9          think of his name.  Sorry.

10  Q    Where's he located, do you know?

11  A    Telegraph Road in Taylor.

12  Q    But you've never sought treatment from your primary

13         care physician related to this incident, correct?

14  A    No, no.

15  Q    All right.  So, are you currently employed?

16  A    No.

17  Q    When's the last time you were employed?

18  A    2009, prior to the car accident.

19  Q    All right.  And where did you work?

20  A    Gouth Sheet Metal in Wyandotte.

21  Q    Have you ever applied for Social Security disability?

22  A    Yes.

23  Q    How many times?

24  A    Well, I applied twice.

25  Q    Have you received it?

1    A    Well, I won my case, but the settlement from the

2         Turner case made it so that I couldn't collect, I

3         don't know, Social Security, because I had such a

4         large sum of money at the time.

5    Q    Have you reapplied since then?

6    A    I don't need to reapply.  I need to let them know I'm

7         broke, and then my income will start coming in.

8    Q    You're broke?

9    A    That I have no money.  They said I can't have any

10        until I dispose of the money I have from the Turner

11        case.

12   Q    And how much was it that you got from the Turner case?

13   A    How much did I get?

14   Q    Yes.

15   A    Fifty-nine thousand.

16   Q    And what did you do with all of that money?

17   A    I had fun.

18                         MR. RADNER:  Objection.

19                         THE WITNESS:  Sorry.

20   A    (Continuing):  I had fun with it.

21   Q    (By Ms. Forbush):  What did you do for fun?

22   A    Casinos all across the country, done a little

23        traveling.

24   Q    Did you take your son with you?

25   A    No.

Page 17

1   Q   Did anybody go with you?

2   A   Just myself.

3   Q   So, you're claiming now that you're broke and you have
4       no money?

5   A   Well, I'm back to where I started before, yes.

6   Q   Well, if I remember from before, you were out collect-
7       ing cans from dumpsters or something.

8   A   Out of trash cans and stuff, yeah.

9   Q   So, that's what you're doing now?

10  A   Oh, I don't have to do that now.  I'm not homeless at
11      the moment, like I was before.

12  Q   Okay.

13  A   I mean --

14  Q   You're able to live with your mom?

15  A   Yeah.  I have some support.  I have some support from
16      outside.  Before, I was living in a dilapidated house,
17      if you remember, that I bought from a tax sale for
18      1700 bucks and spent four years in it.

19  Q   So, what do you do for income?

20  A   Nothing right now.

21  Q   You're waiting for your next settlement or --

22  A   I guess.

23  Q   So, have you notified Social Security that you don't
24      have any money?

25  A   No, I have not, not yet.

1    Q    Why not?

2    A    Because I haven't -- I figured I'd wait and see what

3         happens here.  If this is going to take a while, then

4         I'll tell them that I'm needing my assistance.

5    Q    Do you get food stamps?

6    A    Yes, I do.

7    Q    How long have you been getting food stamps?

8    A    Just a few months now.

9    Q    Did you get them previously?

10   A    Prior to the settlement before, --

11   Q    Yeah.

12   A    -- the Turner settlement?  Yes.

13   Q    How much do you receive monetarily?

14   A    I think it's like 183 a month.

15                    MR. RADNER:  You're talking about

16        food stamps, right?

17                    THE WITNESS:  Yes.  That's all I get

18        is food stamps, no money.

19   Q    (By Ms. Forbush):  How much marijuana did you smoke

20        last night?

21                    MR. RADNER:  Objection, relevance.

22                    THE WITNESS:  What's that?

23                    MR. RADNER:  Go ahead and answer.

24   A    Oh, I don't know.  Maybe a joint.

25   Q    (By Ms. Forbush):  Who do you smoke with?

Page 19

1    A    Myself.

2    Q    Your mom and stepdad don't smoke?

3    A    No.

4    Q    Do you have a valid driver's license?

5    A    Yeah.

6    Q    Have you ever been arrested before?  Well, I know you

7         have.

8                            How many times have you been

9         arrested?

10   A    Oh.  Well, I got picked up in Romulus for a tres-

11        passing warrant in South Rockwood.  I was out there

12        swimming in a quarry and got a ticket in the mail.

13        Just ignored it, because I was traveling.  I was like

14        19 or 20 at the time, and I was moving furniture

15        cross-country, and so I just let it go.  And then I

16        ended up getting a warrant check, and there was a

17        warrant out for me, and they took me into Romulus.

18        South Rockwood was going to come and get me.  Called

19        my dad, and he came and bailed me out.

20   Q    Any other arrests?

21   A    No, that's about it, really, that I can think of.

22   Q    How about schooling?  Did you graduate high school?

23   A    No.

24   Q    Last grade completed?

25   A    Eleventh.  I went over my days of --

Page 20

1    Q    Pardon me?

2    A    I went over my days of allowed tardiness or late or

3         absentee days, so they -- you know, I wouldn't get

4         credit for -- you know, I missed too many days, so my

5         counselor recommended that I go to night school, and I

6         wasn't going to go to night school.  I wasn't living

7         at home at the time.  I was living with a friend.  He

8         got sick of waking me up in the morning for school, so

9         that's why I went over my days.  My fault, you know,

10        for not waking up, but -- then I just started working,

11        moving furniture.  You know, 18, 19 years old, and

12        then, you know, moved forward in my life.

13   Q    All right.  Did you ever get your GED?

14   A    Yes, I did.

15   Q    When did you get that?

16   A    I think '96.  I'm not really sure.  I went to check to

17        see if they were giving the test, and they were, and I

18        took it that day, the first half, and then the second

19        half.  Apparently I passed it.

20   Q    Have you filed any income tax returns in the last 10

21        years?

22   A    No, I have not.  I haven't had any income.

23   Q    Did you win any money at any of these casinos that you

24        traveled to?

25   A    No.

Page 21

1   Q   No?

2   A   I wish.

3   Q   Did you ever receive Social Security benefits?

4   A   Yeah.  Well, I did.  I got -- what was it?  They

5       started putting some money in the bank -- not very

6       much -- and then being that I had money, they said

7       that I -- there was a couple months where they're

8       saying that I -- or I was up good for -- you know, I

9       was entitled to a certain amount up to a certain

10      point, and being that the settlement came in, I'm cut

11      off until I dispose of that money, like if I buy a

12      house or a car or something like that, and then when

13      I'm back down to zero they'll start giving me my 750 a

14      month, which I have to dispose of every month.  If

15      there's anything left over, then they deduct it from

16      the next payment.

17  Q   All right.  So, you got the $59,000 settlement.  Did

18      you use it to buy a house?

19  A   No, I did not.

20  Q   Did you use it to buy a car --

21  A   Oh, yeah.

22  Q   -- or any transportation?

23  A   I bought a car.  I bought a moped.  I bought a

24      bicycle.

25  Q   What kind of car did you buy?

1    A    The Honda, the Honda Odyssey.  I bought it in Arizona,
2         and to get it back to Michigan my mother put it in her
3         name and insured it, so I could get it back here.
4    Q    Why would you be prevented from doing that?  I don't
5         understand.  Why couldn't you do it in your name?
6    A    Because I couldn't drive it cross-country without no
7         plates or anything on it.
8    Q    So, how did you get it here?
9    A    I drove it.
10   Q    Okay.  So, why did you have to put it in your mom's
11        name and not your name?
12   A    Well, initially it was her vehicle.
13   Q    The Honda Odyssey, you bought it from your mom?
14   A    No.  See, she does real estate out there, and it was a
15        real estate deal.  She sold a trailer for somebody,
16        and she took the van as her commission, because she
17        knew I was looking for a van.  I gave her the money
18        for the van.  She plated and insured it so we could
19        get it back to Michigan.
20   Q    How much did you pay for the van?
21   A    A thousand dollars.
22   Q    And you didn't buy any kind of house or anything like
23        that?
24   A    No.
25   Q    Were you paying your mom rent?

Page 23

1    A    (No response.)

2    Q    Were you staying with her during this time?

3    A    Like I say, I do favors for them, you know.

4    Q    All right.  So, the other $58,000 you just spent

5         traveling and --

6    A    Bought my son a bicycle, bought my wife a bicycle,

7         bought them clothes, you know, things that are nice to

8         have, I guess, you know.

9    Q    And you bought a moped?

10   A    Yes.

11   Q    Do you still own the moped?

12   A    Of course.

13   Q    How far do you live from the Romulus Police

14        Department?

15   A    Oh, two-tenths of a mile.

16   Q    How many times have you been to the Romulus Police

17        Department?

18   A    Multiple times.

19   Q    When was the first time you were at the Romulus Police

20        Department?

21   A    First time in my life?

22   Q    Yeah.

23   A    Oh, whew.

24   Q    Other than your arrest for trespassing when you were

25        19.

Page 24

1   A   I don't know.  They got a paper there, and you usually

2       can go into the little vestibule there and grab a

3       newspaper.

4   Q   Okay.  Do you go in there daily?

5   A   No.  It's a weekly paper, but you can stop in and, you

6       know, read the bulletin board and stuff.

7   Q   Okay.  So, in the last five years how many times have

8       you been to the Romulus Police Department?

9   A   Whew.  In five years?  Probably, I'd say on average,

10      five times a year, so 25 times over the five years.

11  Q   And of those five times a year are you ever there for

12      any official reason or just to read the paper or what?

13  A   Well, get the paper, read the bulletin board; that's

14      about it.

15  Q   Do you ever talk to anybody when you come in?

16  A   No, not usually, not always.

17  Q   Do you go to other agencies and read their bulletin

18      boards?

19  A   I've been to Dearborn Heights, been to Westland;

20      that's about it.

21  Q   What do you do at the Dearborn Heights Police

22      Department?

23  A   Well, I'm looking for somebody there I've known in the

24      past that knows somebody that I know.

25  Q   What about the Westland PD, why do you go there?

Page 25

1   A   It's just -- I don't know.  I just go to Westland.

2       I've been in the area.

3   Q   You just drop in at the police department for no

4       reason?

5   A   No, no, not always.  But I've been there, been to the

6       courthouse.

7   Q   For what?

8   A   Just to look around.

9   Q   And what have you been to the Westland Police

10      Department for?

11  A   Just to look around.

12                          Well, I had the incident there where

13      I got a ticket for jaywalking, and another lying

14      police officer saying that I -- called it jaywalking

15      when it wasn't jaywalking, so I had a $90 ticket, you

16      know, I had to pay.

17  Q   I'm sorry.  Did you say "another lying police

18      officer"?

19  A   Yes, yes.

20  Q   Did you pay the ticket?

21  A   Well, yeah.  I fought it as best I could, but the

22      prosecutor told me they didn't have to look at my

23      paperwork, they can ignore it.

24  Q   Have you encountered a lot of police officers that

25      have lied to you?

1   A    Yes, yes.

2   Q    Where?

3   A    All over the place.

4   Q    Do all police officers lie to you generally?

5   A    I'd say a lot of them do.

6   Q    You don't like the police?

7   A    I don't like bad cops.

8   Q    You don't respect the police?

9   A    I don't like bad cops.

10  Q    How many bad cops have you met?

11  A    Quite a few.

12  Q    Like how many, five, 25?

13  A    I'd say nine out of 10 of them are bad.  They get

14       power hungry and power tripping.

15  Q    How many encounters have you had with all of these

16       police officers?

17  A    Countless over the years.

18  Q    Related to what?

19  A    Well, I don't know.  Like digging in the dumpster and

20       getting locked in the back of the police car and then

21       my vehicle searched while I'm locked in the back of

22       the police car, which is a total violation of my

23       rights.

24  Q    Where did that happen?

25  A    In Westland.

1  Q   What did you do about it?

2  A   Nothing.  I was ignorant at the time.  I didn't know

3      what I know now.

4  Q   What do you know now?

5  A   Enough.

6  Q   Enough so that you deliberately go around and try to

7      provoke police officers --

8  A   No.

9  Q   -- to engage with you?

10 A   No, no.

11 Q   You don't do that?

12 A   No, I don't.

13 Q   You don't deliberately try to provoke police officers?

14 A   No, I don't.

15                   MR. RADNER:  Objection.  It was

16     asked and answered.

17 Q   (By Ms. Forbush):  Do you go through dumpsters in

18     Romulus?

19 A   No.  I haven't had to do that in a while.

20                   And the dumpsters, like Staples,

21     because they throw out reams of paper, stuff like

22     that, ink, you know, computer supplies.  You know, I

23     have an adequate supply of blank DVDs and stuff from

24     them just throwing them away.

25 Q   What kind of camera do you own?

1   A   Canon.

2   Q   Like Canon what?  Is it a video camera or --

3   A   Yeah, video camera.

4   Q   When did you purchase that?

5   A   Probably four days prior to this incident.

6   Q   And why did you buy a video camera?

7   A   Because I wanted to have it.

8   Q   What do you film on it?

9   A   Anything I can see.

10  Q   Well, other than filming the exterior of the police

11      department and the vehicles going in and out, have you

12      filmed anything else on that camera?

13  A   Yeah, my son, friends, family.

14  Q   Do you own any firearms?

15  A   Yes.

16  Q   How many?

17  A   Well, I have a .22 and an SKS.

18  Q   I don't know what that is.  What's an SKS?

19  A   It's what you call an assault rifle, I guess.

20  Q   Like an AR-15 or something?

21  A   Like an AK.

22  Q   AK-47?

23  A   Yeah.  It's the same, same caliber.

24  Q   When did you buy that?

25  A   Oh, gosh.  Probably 2007.

Page 29

1    Q    Where do you keep this gun?

2    A    It's in the attic.

3    Q    At your mom's house?

4    A    In the garage in the attic, yeah.

5                        And then I have a .22 Marlin.

6    Q    What do you use these guns for?

7    A    I don't, really.  Fun shooting.

8    Q    How long have you owned the Marlin?

9    A    Since I got it on my 16th birthday.

10                       Oh.  And then I have a .410 shotgun

11        that I got when I was 13.

12   Q    Any other firearms?

13   A    Nope.

14   Q    Do you own any handguns?

15   A    I did, but they got stolen -- one got stolen, and I

16        sold one to my brother.

17   Q    What's your brother's name?

18   A    And I had a Taurus .45 that I sold to a friend of a

19        friend.

20   Q    What's your brother's name?

21   A    My half-brother Billy?  I mean --

22   Q    The brother you said you sold the gun to.

23   A    Kevin.

24   Q    Kevin what?

25   A    Norris.

Page 30

1  Q    Where does he live?

2  A    He lives in South Carolina right now.

3  Q    When's the last time you talked to him?

4  A    Oh, gosh.  Probably five years.

5  Q    Do you have any other brothers or sisters?

6  A    Well, I have a half-sister, Julie.

7  Q    What's her last name?

8  A    Murphy.

9  Q    Where does Julie live?

10 A    Canton.

11               And then I have stepbrothers and

12     stepsisters.

13 Q    From Mr. Needham?

14 A    No.  He had one daughter.  She passed away.

15 Q    Have you ever been under the care or treatment of a

16     psychologist or psychiatrist?

17 A    Nope.

18 Q    Have you ever had to go through any kind of substance

19     abuse counseling or therapy?

20 A    Nope -- well, I had a drunk driving when I was 21, and

21     I had to go classes, whatever.

22 Q    What agency arrested you for drunk driving?

23 A    Oh, Van Buren.

24 Q    Is that a township, county?

25 A    Van Buren Township.

Page 31

1                        I can't tell you what year it was.

2        I was probably 22.  It was a while ago.

3    Q   Any other arrests that you haven't told me about?

4    A   Not that I can think of, no.

5    Q   Where did you buy your camera from?

6    A   Best Buy.

7    Q   How much was it?

8    A   Like 460 bucks.

9    Q   So, that was in June of 2018?

10   A   Uh-huh.

11   Q   Yes?

12   A   Yes.

13   Q   When did you apply for Social Security disability?

14   A   I think 2009.  I was turned down.  Then I called -- I

15       had an attorney -- agency help me with the second

16       application.

17   Q   When was that?

18   A   Just the past few years now.  I can't think of the

19       years, but --

20   Q   Was it before you bought your camera?

21   A   Oh, yeah.  I had the camera with the Turner settle-

22       ment.

23   Q   What's the nature of your disability, as you under-

24       stand it?

25   A   I don't know.

Page 32

1  Q   Do you have some kind of physical disability that

2      precludes you from working?

3  A   Yes.

4  Q   What is that?

5  A   Well, my shoulder and my neck, and I don't get rest.

6  Q   Why don't you get rest?

7  A   Because of the discomfort that I'm in.

8  Q   From your shoulder and your neck?

9  A   Yes.

10 Q   Did you have a doctor fill out disability forms for

11     you on the medical portion of the application?

12 A   No.  I don't think so.  I just collected my medical

13     records and sent them to Social Security, which they

14     reviewed them, and then ended up having a hearing and

15     that, and they determined that I meet the qualifica-

16     tions.

17 Q   Since your car accident in 2009 have you ever tried to

18     return to work?

19 A   Not full time, no, not a regular job.

20 Q   Well, any part-time work?

21 A   No.

22 Q   Well, when you say "not any regular job," what kind of

23     job are you talking about?

24 A   Something that's 40 hours a week and you can make, you

25     know, a decent living at.

Page 33

1  Q  Well, have you had any employment since 2009?

2  A  No.

3  Q  Have you applied for any employment since 2009?

4  A  No.

5  Q  All right.  So, you bought this $460 camera from Best

6     Buy in June of 2018, right?

7  A  Yep.

8  Q  When was the first time you used it?

9  A  Around the house just, you know, shooting a video of

10    my wife and my son.

11 Q  Your wife and son were in town after you bought the

12    camera?

13 A  Yeah.  They were there on the day that the incident

14    happened.

15 Q  Where do they stay when they come to town?

16 A  With me.

17 Q  At your mom's?

18 A  Yeah.

19 Q  Does your wife own a vehicle?

20 A  No.

21 Q  How did she get from Ohio to Michigan?

22 A  I went and got her.

23 Q  What vehicle did you drive?

24 A  The van.

25 Q  The white van?

Page 34

1    A    Yeah.

2    Q    All right.  So, what happens?  You decide to go to the

3         Romulus Police Department, and what date was that?

4    A    June 14th.

5    Q    What day of the week was that?

6    A    I don't really remember what date of the week it was.

7         They're all Saturdays.

8    Q    Pardon me?

9    A    They're all Saturdays.

10   Q    When you don't have a job, every day is a Saturday?

11   A    Yeah.

12   Q    Okay.  So, what time of day did you go to the Romulus

13        Police Department for the very first time that day?

14   A    Well, it wasn't -- see, what piqued my interest, there

15        was a police vehicle following another vehicle through

16        town very closely, and I was waiting for his lights to

17        go on to pull the guy over, and they did.  And as soon

18        as he hit Olive Street there and Goddard, he turned,

19        made a left turn, and then he pulled right in front of

20        the police station and left the vehicle on the wrong

21        side of the road in front of the police station.  And

22        that was when I was on my way back from the store that

23        I'd seen this.  I was on a bicycle.  So, I decided I

24        was going to go home and get my camera and get a

25        picture of that police vehicle parked on the wrong

Page 35

1        side of the road in front of the police station, but

2        by the time I had gotten back up there the police

3        vehicle had been moved, and so I just decided to take

4        some shots of the police department.

5    Q    Okay.  But my question was:  What time of day did you

6        go to the police department on the 14th of June, 2018?

7    A    It was probably quarter to 3:00, 2:45.

8    Q    Prior to 2:45 p.m. --

9                    Well, what time did you get up that

10       day?

11   A    I couldn't tell you.

12   Q    No idea?

13   A    Nope.

14   Q    Was it 6:00 a.m. or 11:00 a.m.?

15   A    I have no idea.

16   Q    What time do you normally get up?

17   A    When do I go to sleep is the problem.  I don't have

18       any sleep.  I'm up and down throughout the night, so I

19       don't get no regular sleep.

20   Q    So, other than marijuana, do you take any other drugs?

21   A    No.  I drink a couple beers once in a while.

22   Q    How much marijuana did you smoke on the 14th?

23   A    That day, none.

24   Q    How about the day before?

25   A    None.

Page 36

1    Q    How come?

2    A    Because my card wasn't new.  That's what I was doing,

3         I was going up to the pot doctor's office to get my

4         license renewed on June 14, and that's when I seen the

5         police car parked in front of the police station, you

6         know, and the incident of him following the truck.  I

7         mean, he was four feet from the guy's bumper, you

8         know, real, real close.

9    Q    Do you know who was in that car?

10   A    No idea.  No idea.

11   Q    And in the police car?

12   A    No idea.

13   Q    Well, as I recall from your prior deposition, I mean,

14        you didn't have a medical marijuana card, but you

15        smoked marijuana.

16   A    No.  I had a card then.

17   Q    I believe you testified it expired.

18   A    Right.  It might've been expired.

19   Q    But the fact that your card was expired didn't stop

20        you from smoking marijuana, based on your prior

21        testimony.

22   A    Right.

23   Q    Is it different now?  Are you telling me when your

24        medical marijuana card expired a few years ago, that

25        from that point on you didn't smoke marijuana until

1        you had a valid card, is that your testimony?

2  A    No.  It's not my testimony.  But I probably didn't

3        have any at the time, and I wanted to get my card

4        renewed, because it's not like I can go to the store

5        and buy it without the card being renewed.

6  Q    You probably didn't have any or you didn't have any?

7  A    I don't recall.

8  Q    Then how do you know you didn't smoke marijuana that

9        morning or the day before if you don't remember?

10  A    Because I was anxious in getting my card so I could go

11        to the store and buy some.  Don't you get that?

12  Q    So, you ride your bike up to what?  Did you call it

13        the pot doctor?  Is that what you called it?

14  A    Yeah.  It's right there in Romulus.  I couldn't think

15        of his name.  It's on Goddard.

16  Q    Did you go inside?

17  A    No.  He was closed that day.

18  Q    And then where did you go on your bike?

19  A    I was on my way back home, and that's when I seen the

20        police car parked in front of the police station.

21        Went home, walked back to the police station.  The

22        police vehicle was moved by that time, so I decided to

23        get shots of the building just, you know, for raw

24        footage.

25  Q    Raw footage of what?

Page 38

1   A    For creating a video, an edited video later, you know,
2        like scenes.
3   Q    Were you making a movie or a documentary or something?
4   A    Not yet, but I will.
5   Q    About what?
6   A    Whatever.  I don't know.  We'll see what the subject
7        turns out to be.
8   Q    Have you ever made a movie before or --
9   A    No.
10  Q    -- a documentary?
11  A    No.
12  Q    How many hours have you used your video camera?
13  A    Oh, you mean total video on it?  Probably just a
14       couple hours' worth on it.
15  Q    All right.  So, do you tell mom, stepdad, wife, son,
16       "Hey, I'm back.  I'm walking up to the police
17       department" or --
18  A    No.
19  Q    Why not?
20  A    Because they would've stopped me.
21  Q    Why would they have stopped you?
22  A    Because they think I'm going to get killed.
23  Q    Because they're afraid you're going to provoke the
24       police in some fashion?
25  A    Well, I might get a psycho, and he might just decide

1    to off me.

2  Q    You're not the psycho, the police are the psycho?

3  A    I'm not saying all police are, but there are ones,

4       where it goes to their head and they get power hungry

5       and they get used to it.  It's just --

6  Q    And you have knowledge of these nine out of 10 bad

7       cops, and you walk up to the police department to see

8       if you can provoke or incite some kind of incident so

9       you can file a lawsuit and get some money to live on,

10      fair?

11 A    No, not at all.

12 Q    No, not at all?

13                    So, you don't tell your family where

14      you're going or what you're doing, because they will

15      stop you from this behavior, correct?

16 A    Well, they think that I'm going to run across a rogue

17      cop that's going to kill me.

18 Q    All right.  So, you walk back to the police depart-

19      ment.  Tell me, what streets do you take to get there

20      from your home?

21 A    The only ones I can think of is Olive and Goddard, and

22      then I think it's Romaine and then Chase.

23 Q    And you live on Chase?

24 A    Yes.

25 Q    And the police department is on Olive?

Page 40

1   A    Yes.

2   Q    How long did it take you to walk there?

3   A    Oh, five minutes maybe.  I mean, it's two-tenths of a

4        mile.

5   Q    And what did you film on your way of the police

6        department?

7   A    Nothing.

8   Q    Nothing?

9   A    Not on my way there.

10  Q    So, that raw footage didn't interest you.  The police

11       department specifically interested you for filming,

12       correct?

13                     MR. RADNER:  I'm going to object.

14       This was asked and answered why he was filming.

15  A    No.  You're misunderstanding me.  I went there to get

16       shots of the building; that's it.

17  Q    (By Ms. Forbush):  Right.  You were interested in the

18       police department, nothing else?

19  A    The building, yes, --

20  Q    Okay.

21  A    -- with the signage out in front and stuff like that.

22  Q    What sign?

23  A    It says "Romulus Police Department."

24  Q    Did you film that?

25  A    Yes, I did.

Page 41

1   Q   What else did you film?

2   A   I got a couple shots of the building from different

3       sides, sally port entrance, and then from the corner

4       back down the street, you know, another shot of the

5       sign.

6   Q   What street are you talking about now?

7   A   Olive.

8   Q   Okay.  Did you go down any other streets?

9   A   Biddle.  Biddle is the street that is the entrance to

10      the back lot of the police station.

11  Q   A secured entrance to the police department where the

12      officers enter and staff?

13  A   Right.

14  Q   It's off of Biddle, right?

15  A   Yes, yes.

16  Q   So, you got there, you filmed the front of the

17      building --

18  A   Uh-huh.

19  Q   -- on Olive Street?

20  A   Yeah.

21  Q   All right.  And did you walk down the sidewalk --

22  A   Yes.

23  Q   -- and go down Biddle to film some more?

24  A   Yes.

25  Q   And there's a fence, a chain-link fence along the

Page 42

1       police department on Biddle?

2    A  Yes.

3    Q  All right.  Did you go inside that chain-link fence?

4    A  No.

5    Q  So, what did you do as you were walking down Biddle?

6       What are you filming?

7    A  I was just walking down the sidewalk and just filming,

8       and as I approached the gated area, I guess where the

9       opening is, there was one car going in.  I couldn't

10       see it.  You know, I think it was a Ford.

11    Q  Who was in that car?

12    A  I believe this gentleman here.

13    Q  Who?  Who are you pointing at?

14    A  This gentleman.  I don't know his name.

15    Q  You don't know his name?

16    A  No.

17    Q  How do you know him?

18    A  How do I know him?

19    Q  Yeah.

20    A  Encounters that day at the police station.

21    Q  Any other encounters, other than that day on June

22       14th?

23    A  No, no, no.  I've seen some video of him before that.

24    Q  What video have you seen of him?

25    A  There's a Stuber, Stubberd or whatever, Rupert

Page 43

1       Stubberd or something like that.

2   Q   Say it again.

3   A   I can't think of the guy's name exactly.

4   Q   Did you say Rupert?

5   A   I think it's Rupert Stubberd or something like that.

6       I'm not --

7   Q   Stubberd?

8   A   Yeah.  I'm not sure.  But he's, I don't know, he's

9       like an autistic gentleman who keeps getting his

10      window broken out, because he drives around without a

11      license.  I guess they won't give him a driver's

12      license, but he still wants to go places, so -- I

13      mean, he's done.  He's up in Mexico now.  (Laughing.)

14                      MR. RADNER:  Sorry.  Do you mind if

15      we take a break?

16                      MS. FORBUSH:  Sure.

17                      (Recess taken.)

18                      MS. FORBUSH:  Ready to go?

19                      THE WITNESS:  Sure.

20  Q   (By Ms. Forbush):  Mr. Norris, you had indicated that

21      you had watched a video of this officer prior to June

22      14th, 2018.  What video had you observed?

23  A   (No response.)

24  Q   You told me about some autistic gentleman who now

25      lives in Mexico, but you didn't tell me what video you

1          saw.

2     A    I don't know.  They were knocking on the door and

3          asking -- I guess they were there for service, a

4          report of a female in distress and, you know, he

5          wouldn't let them in the door.  Ended up, you know,

6          them calling him ma'am and stuff when they were

7          leaving, when he was clearly a man, just trying to

8          downplay it, you know, his disability and stuff,

9          making fun of him, I guess.

10    Q    So, on the date that we're here about, the June 14th,

11         2018 date, you said you saw a Ford vehicle go into

12         where, the restricted parking lot in the back of the

13         police department?

14    A    Yes.

15    Q    All right.

16    A    Yeah.  It was entering through the gate.  Well, when I

17         was on the corner, he turned the corner.

18    Q    When you're talking about "the corner," you're talking

19         about the corner of Biddle and Olive?

20    A    Yes.

21    Q    Okay.  Go ahead.

22    A    And I was just getting my shots, you know, raw

23         footage, stuff that you cut in, you know, different

24         scenes or whatever.

25    Q    Have you made other movies before?

Page 45

1  A    No, I haven't.  I don't have any of those skills yet.

2       I mean, I'm working on it.

3                      It's better to have the raw footage,

4       and then you can splice it together the way you want

5       when you learn how to do it.

6  Q    All right.  What other raw footage have you obtained?

7  A    What, police departments?  That's it.  That was it,

8       the one, because I just had gotten the camera.  Oh,

9       no.  I got Van Buren too.  I went over to Van Buren

10      too.

11 Q    Van Buren Township?

12 A    Yeah, and the courthouse.  I've been to the courthouse

13      videotaping.

14 Q    Do you go inside the courthouse when you're video-

15      taping?

16 A    No.  You can't get into the courtroom.  They restrict

17      your First Amendment at the door for some reason.

18                      Because it used to be, because of --

19      like when I had the Turner case, I was able to take my

20      tablet right in.  And I had the police video from the

21      police car, showed the public, the public pretender

22      that I wasn't guilty, because he was telling me I was

23      guilty, because the officer said I was guilty, until I

24      proved it by the video.  And he went in and talked to

25      the prosecutor, and the prosecutor nolo-ed the

Page 46

1       charges.

2   Q   What charges are you referring to?

3   A   On the Turner case.

4   Q   You said your "tablet."  You have your tablet with you

5       today?

6   A   Not the one that I had at the time.  It's a little bit

7       smaller than that one.

8   Q   But on the date of our incident in June of 2018 --

9   A   Uh-huh.

10  Q   -- you didn't have a tablet, did you?  You had your

11      video camera?

12  A   My video camera, yes.

13  Q   And this is a handheld video camera?

14  A   Yes.

15  Q   Did you have your cellphone with you?

16  A   Nope.

17  Q   And you're recording your deposition here today as

18      well, correct?

19  A   Just on audio.

20  Q   Okay.

21  A   I was told it was going to be video recorded, but

22      it's not, so -- I thought it was going to be video

23      recorded, you know, the deposition.

24  Q   Oh, okay.  So, you see a vehicle, a Ford vehicle, not

25      a police car, right, --

1    A    No.

2    Q    All right -- drive into --

3    A    A Fusion.

4    Q    -- the gated area?

5    A    It was entering, yes, as I was approaching.

6    Q    As I understand it, there's the gated area, and then

7         inside the gated area there's another gate that allows

8         you into the parking lot behind the police department.

9    A    Well, the first part is open.  There's a dumpster

10        there, and it's wide open, and then --

11   Q    Did you go inside that initial gated area where the

12        dumpster is?

13   A    No, I did not.

14   Q    Why not?

15   A    Why should I?

16   Q    I don't know.  Footage, raw footage.

17   A    I can get my footage from the sidewalk.

18   Q    Okay.  So, you never left the sidewalk?

19   A    Nope.

20   Q    All right.  Did you ever impede anybody's ability to

21        get in or out of the driveway?

22   A    Nope.

23   Q    Nobody ever honked at you to move?

24   A    Well, yeah.  There was a vehicle trying to enter, you

25        know, as the chief was talking to me.  You know, he

Page 48

1           had my attention, and I was videotaping that way.

2                          But, no, I think there was plenty of

3           room for somebody to get in.  And, besides, it's a

4           sidewalk.  You know, you can be on the sidewalk.  If

5           somebody wants to get in, they'll alert you to, "Hey."

6    Q     And you heard the vehicle honk their horn --

7    A     Right.

8    Q     -- for you to move so they could enter?

9    A     I backed up two steps.

10   Q     Were you recording the keypad?

11   A     No.

12   Q     Did you see the keypad?

13   A     No.

14   Q     You never saw the keypad?

15   A     No.

16   Q     You never saw the stand that has the --

17   A     No.

18                         MR. RADNER:  I'll object.  Asked and

19           answered.

20   Q     (By Ms. Forbush):  I'm just asking:  Do you know

21           there's a keypad that allows entrance?

22   A     There's a post.  There's a post sticking up there.

23   Q     Yeah.

24   A     A couple yellow posts.

25   Q     When you saw this Ford Fusion go in did you see him do

Page 49

1           anything --

2    A    Nope.

3    Q    -- at that post?

4    A    Nope.  I was too far away.

5                      As I say, let's watch the video.

6    Q    With all due respect, sir, this is my deposition.

7         I'll ask the questions.

8    A    Okay.

9    Q    So, if you'll just answer my questions, we can get

10        done more quickly, okay?

11   A    Yep.

12   Q    I'm not here to argue with you.

13   A    All right.

14   Q    All right.  So, you see the Ford Fusion go in.  What

15        do you do next?

16   A    I continue walking.

17   Q    You're standing at the corner of Biddle and Olive at

18        that point, right?

19   A    Approaching that direction, walking that way.

20   Q    Okay.

21   A    Couldn't see a plate on the car.  You know, I can

22        basically make it out that it's a Ford.  You can

23        recognize it's a Ford.  I can't remember if it was

24        silver or white.

25   Q    When's the last time you watched the video?

Page 50

1    A    Last night.

2    Q    Which video did you watch?

3    A    I watched the one -- I watched my copy, not the Black

4         Label copy, which has been taken down.

5    Q    What's the Black Label copy?

6    A    Black Label is -- I don't know.  Hayes, a lot of

7         people send him videos, and he posts them on his

8         channel.

9    Q    Well, when you say you watched your video, are you

10        talking about the video from your camera, or are you

11        talking about --

12   A    Yes, my camera, my raw copy.

13   Q    All right.  Did you ever watch the body camera videos

14        of any of the officers?

15   A    Yes, I have.

16   Q    When is the last time you watched those?

17   A    Oh, it's been a while.

18   Q    Did you see any dash cam videos?

19   A    No.  There are none that I'm aware of, that I can

20        think of.

21   Q    All right.  Whose body cameras have you watched?

22   A    Several of the officers'.  I wouldn't know whose I was

23        watching at the time.

24   Q    But you haven't watched those in a while?

25   A    No.  I haven't watched them in a little bit, no.

1   Q   You only watched the videotape that you actually

2       recorded from your camera, correct?

3   A   Correct, yes.

4   Q   Okay.  And did you submit that video to Black Label?

5   A   I sent him a copy of it.

6   Q   All right.

7   A   A link to, you know, my Google account, I guess, and

8       he had access to it.  He must've downloaded a copy of

9       it, did his research and shot his video.

10  Q   All right.  Did you provide a copy of your video to

11      anyone else?

12  A   Just my attorney.  I mean, gave him a link, sent him a

13      link to it.

14  Q   Anybody else?

15  A   No, not that I can think of.

16  Q   Send it to any family or friends?

17  A   Just links to it, you know.

18  Q   Yeah.  Who have you sent it to?

19  A   Oh.  I showed it to my dad, showed it to my friends.

20  Q   Okay.  What friends have you showed it to?

21  A   Oh, my wife, my friend Terry.

22  Q   Terry who?

23  A   Fournier.

24  Q   How do you spell that one?

25  A   F-o-u-r-n-i-e-r.

Page 52

1   Q   And Terry, is that male or female?

2   A   Male.

3   Q   Where does Terry live?

4   A   Belleville, Sumpter.

5   Q   Does he work?

6   A   Yeah.

7   Q   Where does he work?

8   A   I think he's an independent contractor, drywaller.

9   Q   Who else have you shown it to, other than your wife,

10      your dad and Terry Fournier?

11  A   My mom; that's about it, that I can think of.

12  Q   You didn't show it to your son?

13  A   Yeah.  My son seen it.  He knows it by heart.

14  Q   Anybody else?

15  A   Nope.

16  Q   Why did you show it to your wife?

17  A   Just to show it to her.

18  Q   Why?

19  A   Why not?

20  Q   You had no particular reason, just said, "Hey, look

21      what happened to me"?

22  A   That's it.

23  Q   How about Terry Fournier?

24  A   "Look what happened to me."

25  Q   When you met with Mr. Fournier and showed him the

Page 53

1    video -- or did you send him a link?

2  A  No, I went.  He's not computer savvy, so --

3  Q  So, you went to his house and took your tablet with

4     you --

5  A  Yep.

6  Q  -- and said, "Check this out"?

7  A  Yep.

8  Q  "I'm going to get another settlement.  I'm going to

9     have more money.  Let's go gambling"?

10                      MR. RADNER:  Form and foundation.

11 Q  (By Ms. Forbush):  That kind of conversation?

12                      MR. RADNER:  Form and foundation.

13 Q  (By Ms. Forbush):  Did you have a conversation with

14    him like that?

15 A  Oh no, not really, no.

16 Q  No?

17 A  No, because they think I'm playing with fire.

18 Q  And you enjoy that?

19 A  Somewhat, yes.

20 Q  All right.  So, you're walking down the sidewalk along

21    Biddle.  What do you do?

22 A  What do you mean, what do I do?

23 Q  What happens next?  You see the Ford Fusion go in.

24    Tell me what happens next.

25 A  I'm walking forward and videotaping, and just so

Page 54

1      happened Chief Settles was on a bicycle.

2   Q   Did you know Chief Settles before this date?

3   A   Of course.

4   Q   How did you know him?

5   A   Well, I don't know.  I've had run-ins with him before,

6      had a -- he called me a sovereign citizen in front of

7      the city council at a city council meeting; that's all

8      on video.

9                  I actually was quite surprised he

10     would know who I was.

11  Q   So, you've been to city council meetings?

12  A   Of course.

13  Q   How many times at Romulus?

14  A   Oh, four or five times.

15  Q   And why do you go to those?

16  A   Just to see what's happening.

17  Q   Do you always speak every time you go?

18  A   No.

19  Q   How many times have you spoken at these meetings?

20  A   Once.

21  Q   Was that related to your arrest by Mr. Turner?

22  A   Yes, it was.

23  Q   What was the purpose of your speech?  What were you

24     talking about?

25  A   I wanted them to settle the matter; that it would be

Page 55

1      amicable for them to settle it without me having to

2      make it a federal case, which they just totally

3      ignored me.

4  Q   And what did Director Settles say about you, that you

5      recall?

6  A   That he called me a sovereign citizen.  He was just

7      trying to downplay what had happened with the Turner

8      incident.

9  Q   Do you consider yourself a sovereign citizen?

10 A   No.

11 Q   Do you have an understanding of what a sovereign

12     citizen is?

13 A   Absolutely.  The police are sovereign.

14 Q   What do you mean by that?

15 A   They're the ones who judge themselves and find that

16     they've done nothing wrong, and that's the definition

17     of a sovereign.  You know, they're the ones who are

18     sovereign citizens.

19 Q   Is anybody else a sovereign citizen?

20 A   What do you mean?

21 Q   Well, you said you knew what a sovereign citizen was.

22     You said the police are sovereign citizens.  Is

23     anybody else, besides a law enforcement officer, a

24     sovereign citizen?

25 A   The state.  The state is sovereign.

Page 56

1   Q   Anybody else?

2   A   I don't know.

3   Q   You've never heard of a private citizen referring to

4       themselves as a sovereign citizen when they say, "I

5       don't pay taxes.  I don't have a license plate.  I

6       don't have a driver's license"?  You don't know any-

7       body like that?

8   A   No.

9   Q   Okay.  So, you're walking down the sidewalk on Biddle,

10      and you're filming.  What are you filming?

11  A   The back lot of the police department, --

12  Q   And what --

13  A   -- just because of the building.

14  Q   What do you mean "just because of the building"?

15  A   Just, you know, what's going on back there, people

16      coming and going.

17  Q   So, you filmed the area where the security signs are

18      that you can't go into, correct?

19  A   Yeah, from the sidewalk.

20  Q   Like if we look at Deposition Exhibits 3 and 4, it

21      shows the keypad and the chain-link fence, correct, to

22      get into the back lot?

23  A   Yeah, but that's a little bit further away than I was.

24                      Because if you see this line right

25      here and this pole --

Page 57

1   Q   You have to tell me what exhibit you're referring to.

2   A   Exhibit No. 4.

3   Q   Okay.  And what line are you referring to?

4   A   To the yellow line that's on the opposite side of the

5       fence there and this pole.  I had never gone past that

6       point with it, you know, if you were to line those up.

7       So, if you take that line --

8                       I have an overhead shot from Google,

9       if you --

10  Q   No.

11  A   Oh.  You can't do that?

12                      MR. RADNER:  Just answer her

13      questions.

14                      THE WITNESS:  All right.  I'm sorry.

15  Q   (By Ms. Forbush):  So, what was the point you were

16      trying to make by showing me the photograph?

17  A   That I wasn't blocking the gate at all.  There was

18      plenty of room.  If the car was to come straight in, I

19      wouldn't have been in their way.

20  Q   Well, you recall when you reviewed your video last

21      night there was a car that honked their horn --

22  A   Correct.

23  Q   -- at the time you were there, right?

24  A   Correct.

25  Q   And you moved as a result of that, is that right?

Page 58

1   A   I backed up two steps, yes.

2   Q   And then it's your testimony that you never went past

3       the chain-link fence --

4   A   Correct, and that sign wasn't there.

5   Q   -- depicted in Exhibit No. 5?

6                    Pardon me?

7   A   That sign was not there.

8   Q   And you're referring to the restricted area sign?

9   A   Correct.

10  Q   Can I have those back, please?

11  A   Certainly.

12  Q   All right.  So, you're filming cars going in the back

13      lot of the police department?

14  A   Not necessarily.

15  Q   What happens?  You said you saw Director Settles.

16  A   Yes.

17  Q   You said you'd had contact with Director Settles at a

18      Romulus City Council meeting.

19  A   Uh-huh.

20  Q   Had you had any other contact with him prior to this

21      incident?

22  A   Yeah.  I had a meeting with him in his office.

23  Q   Related to the Turner --

24  A   Yes.

25  Q   --lawsuit?

Page 59

1   A   Yes.

2   Q   Anything else?

3   A   No -- oh, yeah.  Well, there was.  After this recent

4       incident I ran into him at city hall.

5   Q   When was that?

6   A   Oh, probably a week after the 14th.  So, I went up

7       there to, I don't know, pay a water bill or something,

8       and he happened to be there.

9   Q   Did you talk to him?

10  A   Yeah.

11  Q   What did you talk about?

12  A   He just wanted to know why we did -- you know, why I

13      was doing what I was doing.

14  Q   He asked you why you were filming the police depart-

15      ment?

16  A   I don't really recall, but I have it recorded, so

17      you'll probably want a copy of that.  And I haven't

18      listened to it.

19  Q   What did you tell him?

20  A   He just wanted to know why I do what I do, and I told

21      him, "It's just the things in the past.  You know,

22      past experiences with police has made me what I am."

23  Q   What are you?

24  A   Someone who stands up for themselves.

25  Q   Is that what it is --

Page 60

1   A   Yes.

2   Q   -- that you're doing?

3   A   Yes.

4   Q   So, for instance, on the date that Derek Turner drove

5       by in his patrol car --

6   A   Uh-huh.

7   Q   -- and you flipped him off and gave him your middle

8       finger, --

9   A   Uh-huh.

10  Q   -- you were standing up for yourself, is that right?

11                    MR. RADNER:  Form and foundation.

12  A   No.  I was making a, I don't know, a statement, I

13      guess.

14  Q   (By Ms. Forbush):  Okay.  But you weren't standing up

15      for yourself at that point?

16  A   Oh, yeah.  I was standing up for everybody.

17  Q   By flipping off the police?

18  A   Yes.

19  Q   So, Director Settles is on a bicycle.  Does he

20      approach you?

21  A   Yeah.  He's riding through the parking lot, and he

22      approaches the gate, and he asked me if he can help

23      me.

24  Q   And what did you say?

25  A   Nothing.

Page 61

1  Q  You just continue filming him?

2  A  Yes.

3  Q  Then what happened?

4  A  Him and another officer approached me.

5  Q  Who was the other officer?

6  A  I don't know his name.  This gentleman here.

7  Q  You're pointing to the officer at your deposition

8     today?

9  A  Yes.

10  Q  And what happens when they approach you?

11  A  (No response.)

12  Q  You're still filming, I assume.

13  A  Yeah.

14  Q  What is said or done?

15  A  It's all caught on video.

16  Q  I'm asking for your memory.

17  A  He wanted to know what I was doing.

18  Q  Okay.  What did you say?

19  A  It's none of his business.

20  Q  Is that what you said?

21  A  I'm pretty sure that's what I said.

22  Q  And then what happened?

23  A  He explains that he had a problem with me filming the

24     police lot.

25  Q  Who said that?

Page 62

1   A     Settles, Chief Settles.

2   Q     Did he say why?

3   A     He wasn't very clear on it.  He just said they had an

4         issue with it.

5   Q     And what did you say?

6   A     You know, nothing really.  I don't remember saying

7         anything.

8                    Then he wanted to know why, and I

9         said, "Because I can."

10  Q     Okay.  What else happened?  Tell me everything that

11        happened.  Don't leave anything out.

12  A     He started touching me, feeling around my waist and

13        everything.  I didn't like it.

14  Q     Did he say anything before he touched you?

15  A     No, just started touching.

16  Q     He never said, "I've got to check you for weapons"?

17  A     Nope.

18  Q     That's not on your video?

19  A     Not on my video.

20  Q     Really?

21  A     Yeah.  That's after, after I complained about it.

22  Q     Where did he touch you?  Where did he touch you?

23  A     Around my waist, my belly.

24  Q     Did he put his hand in your pants or --

25  A     Well, not appropriate touching.

Page 63

1   Q    I want you to describe for me everywhere that Director
2        Settles touched you with his hands.  Don't leave any-
3        thing out.
4   A    He started touching on me, feeling on me.
5   Q    Where?
6   A    I moved.
7   Q    I need to know where he touched you.
8   A    Around my waist, my belly.
9   Q    Was this the outside of your clothing, the inside of
10       your clothing?
11  A    It was obviously the outside, because he was doing it
12       quickly.
13  Q    A quick patdown of your pants?
14  A    I guess.  I didn't cooperate, because he didn't warn
15       me he was about to do that.  He didn't say, "Stop.
16       You're under arrest."
17  Q    When you say you didn't cooperate, what did you do?
18  A    What was that?
19  Q    You said, "I didn't cooperate, because he didn't warn
20       me."  What did you do that was not cooperative?
21  A    I was shocked that somebody started grabbing on me,
22       started feeling on me, and I wasn't, you know, aware
23       of it until it started happening, and that's why I
24       reacted to it.
25  Q    What did you do?  What was your reaction?

Page 64

1   A   I moved.

2   Q   Okay.  Where did you move?

3   A   And I told him to stop.

4   Q   You just said, "Stop"?

5   A   Yeah, "Stop."

6   Q   Or did you say anything else?

7   A   "Stop touching me.  Stop."

8   Q   And then what happened?  Don't leave anything out.

9   A   He said he was checking me for weapons.  And I told

10      him, "I have no weapons, so stop touching me," and so

11      I removed myself and started moving away.

12  Q   What do you mean you removed yourself?  What did you

13      do?

14  A   I backed down the sidewalk.  I was videotaping and

15      continuing to get what was going on.

16  Q   And what's being said at this point?

17  A   The chief -- I don't know.  The lady in the car gave

18      him a radio, and he made some sort of call for help, I

19      guess, or backup or something.

20  Q   When you say "lady in the car," what lady are you

21      talking about?

22  A   There was a lady that was pulling into the gate.

23  Q   The one who beeped her horn at you?

24  A   Right.

25  Q   So, she gave the radio to the director?

Page 65

1    A    Chief Settles, yes.

2    Q    Did you hear what he said on the radio?

3    A    No.  I couldn't hear what he said.

4    Q    What were you doing at this point?

5    A    I was video recording.

6    Q    Just standing there?

7    A    Yep.

8    Q    Not backing up anymore?

9    A    No, I had backed up about 15 feet.

10   Q    Where was the officer, the other officer?

11   A    They were both standing at the gate still.

12   Q    Both the chief and the officer?

13   A    Yes.

14   Q    And then what happened?

15   A    They started approaching me, so I started backing up.

16        They were telling me to stop, and I told them I didn't

17        want to stop, and I didn't have to talk to them and

18        that I didn't want to, and they insisted.

19   Q    How did they insist?

20   A    Well, one of them grabbed my arm.

21   Q    Which one?

22   A    This gentleman here.

23   Q    Okay.  So, the officer grabbed your arm.  Which arm?

24   A    My right arm.

25   Q    Did he grab it with one hand, two hands?

Page 66

1  A    First, I think it was one, and then he put the other
2       hand on top over here.
3  Q    So, when he first grabbed you with his hand, which
4       hand did he grab you with, do you know?
5  A    I don't know.  I wasn't paying attention to that.
6  Q    So, he grabbed your right arm.  Where did your right
7       arm first get touched?
8  A    Right here.
9  Q    You're motioning to your upper bicep?
10 A    Yep.  And then Chief Settles was blocking the side-
11      walk, so I couldn't progress any further in that
12      direction.
13 Q    What, he got behind you and blocked you from walking
14      toward Olive?
15 A    (No response.)
16 Q    Because you're backing up toward Olive.
17 A    Well, I was backing up, and then they, you know, they
18      approached me really fast, you know, faster than I was
19      walking.
20 Q    Were they running?
21 A    No, faster than I was walking.
22 Q    Backward?
23 A    Yes.  I was stepping backwards.  I might've been like
24      forward, but -- because I can see the screen.  As long
25      as I'm getting the shot and I can tell that it's in,

1        in the viewfinder or whatever.

2                    I just indicated I didn't want to

3        talk to them, had no desire to talk to them, and I

4        wanted to be left alone.

5  Q    Did Director Settles get behind you, and that's how he

6        stopped you from backing up?

7  A    Yeah.  They surround -- kind of surrounded me, you

8        know, blocking my way.

9  Q    So, Director Settles and this other officer surrounded

10       you?

11  A    Well, he grabbed hold of me on the arm, and then

12       Director Settles was right here so I couldn't move.

13  Q    On your left side?

14  A    Yeah, so that I couldn't move forward anymore.

15  Q    I thought you were moving backward.

16  A    Well, I might've been, but backwards is forward.

17  Q    So, then what happens?  The officer grabs your arm.

18       Chief Settles blocks your left side.  What happens

19       then?

20  A    They grab hold of me and snatched --

21  Q    Who grabs hold of you?  You need to be specific.

22  A    The officer and --

23  Q    I thought he already had ahold of your right bicep.

24  A    Well, they got a little more forceful.

25  Q    So, what happened?  Tell me specifically what each

Page 68

1        person did.

2    A   They started twisting my --

3    Q   You're saying "they."  I need to know who touched you.

4    A   Well, there's two people there -- three people.

5    Q   All right.  The chief --

6    A   The chief, one officer and me.

7    Q   Okay.

8    A   Okay.  "They" would be the officer and Chief Settles.

9    Q   I want to know what the officer did.  He's got you by

10       your right bicep.  What else did he do, if anything?

11   A   Squeezed my arm.

12   Q   Okay.  Did he do anything else?

13   A   He kept ahold of my arm.  Chief Settles grabbed hold

14       of my hand with my camera in it and started twisting,

15       twisting it out of my hand.

16   Q   Did your camera fall on the ground?

17   A   No.  It was ripped from my hands.

18   Q   By who?

19   A   I believe Chief Settles.

20   Q   Was your camera damaged?

21   A   No, by my tripod was.

22   Q   Where was your tripod?

23   A   On the bottom of the camera.

24   Q   So, you're carrying your video camera, and it's hooked

25       to a tripod, and you're walking down the sidewalk

Page 69

1          filming.  Is that what you're doing?

2    A     Correct.

3    Q     Did you ever have it set up on the tripod?

4    A     No.  The tripod was all collapsed, and I was using it

5          as a, you know, as a gimble or a stick, --

6    Q     To hold it?

7    A     -- just to hold it, yes.

8    Q     So, it's your testimony that Chief Settles grabbed

9          your left arm.  Where did he grab your left arm?

10   A     I really couldn't tell you.  It was too quick for me

11         to even notice.

12   Q     What were you wearing?

13   A     A white shirt and shorts; that's it.

14   Q     Did you have any alcohol to drink that day?

15   A     Nope.

16   Q     Are you on any medication?

17   A     Yeah.  I'm on heart medication, blood pressure

18         medication.

19   Q     Did you take your meds that day?

20   A     I believe so, yes.

21   Q     No other street drugs, --

22   A     Nope.

23   Q     -- anything like that?

24   A     Nope.

25   Q     So, the officer squeezed your right arm, and then the

Page 70

1      chief grabbed your left arm and ripped the camera from

2      your left hand, is that right?

3   A  Yes.

4   Q  Did they do anything else to you physically?  And be

5      specific.  How about the officer first, other than

6      grabbing your right bicep, did he do anything?

7   A  Well, they handcuffed me.

8   Q  Who handcuffed you?

9   A  I don't know.  I couldn't see behind me.  I couldn't

10     see who it was.

11  Q  So, the officer has your right arm.  Settles has your

12     left arm, takes your camera away.

13  A  Uh-huh.

14  Q  What happens next?

15  A  They handcuff me.  Chief Settles reaches into my back

16     pocket, pulls my ID out, pulls it out and reads it,

17     and then informs all the other officers that I just

18     sued the Romulus Police Department and, "This is the

19     guy that just sued us."  Like, you know, in other

20     words, "This is the guy you want to get, guys."

21  Q  But he never said that, though, did he?

22  A  Well, he indicated it pretty much.

23  Q  How did he indicate that?  Tell me exactly what he

24     said.

25  A  "This guy just sued us."

Page 71

1    Q    Okay.  And that was true, right?

2    A    Correct.

3    Q    What else was said?

4    A    That's about it, really.  I told him that he's

5         screwing up, that they're messing up again, and that

6         they would be better off to just let me walk away

7         right now, but they weren't interested in that.  And

8         he said that, he told me that they're going to do it

9         right this time.  They're going to cite me and release

10        me.  And I said, "It's still not right.  I should've

11        never been touched."

12   Q    Have you told me everything that the officer said to

13        you?

14   A    Everything that I can think of.

15   Q    Have you told me everything that Settles said to you?

16   A    I imagine so, yes.

17   Q    Do you know, in looking at Exhibit No. 6, whose

18        vehicle is contained in that picture or depicted in

19        that photograph?

20   A    No, but that's the vehicle I was accused of parking

21        there.  I believe it was one of the construction

22        worker's across the street, because they were tearing

23        up the -- I guess doing the water lines there or some-

24        thing.

25   Q    When were you accused of parking there?  I thought you

Page 72

1        told me everything that was said to you.

2   A   What do you mean?

3   Q   You said somebody accused you of parking there.  When

4        did that happen?

5   A   During the meet -- during the confrontation, I guess.

6   Q   Who accused you of parking there?

7   A   Well, Chief Settles asked me if it was my vehicle, and

8        then he answered that yes, that was his vehicle.

9   Q   Was that before or after you were handcuffed?

10  A   Before.

11  Q   Okay.  So, is there anything else that these officers

12       or the chief said to you that you haven't told me

13       about?  I asked you to tell me about everything, and

14       you didn't tell me about that.

15  A   I don't know.

16  Q   What else?  What else did they say?

17  A   Nothing, that I can think of.

18  Q   So, the officer clearly thought for whatever reason

19       that was your vehicle, right?

20                  MR. RADNER:  I'll object.  There's

21       no way he can know that.

22  Q   (By Ms. Forbush):  He voiced it, right, while you were

23       there.  He said, "That's his vehicle," right?

24  A   No.  Chief Settles asked me, "Is that your vehicle?"

25       And I refu -- I wouldn't answer.  I don't answer.  All

Page 73

1    right?  I don't answer questions.  And if I do, I
2    usually pause for seven or eight seconds prior to
3    giving an answer.
4  Q  So, when Chief Settles asked you if that was your
5    vehicle, you had no intention of answering his
6    question?
7                    (Cellphone interruption.)
8                    MS. FORBUSH:  I'm sorry.
9  A  I felt it not necessary to answer his question.
10  Q  (Continuing):  All right.  And then the officer stated
11    in response to Settles' question that it was your
12    vehicle?
13  A  Yeah.
14  Q  Do you remember anything else that the chief said
15    about the vehicle?
16  A  That it's illegal parked, and I'm going to get a
17    ticket for illegally parking, and he needed my
18    driver's license and registration, at which point I
19    was trying to exit the situation.
20  Q  So, you didn't provide your driver's license or
21    registration?
22  A  For what?  I wasn't driving.  I walked.  I shouldn't
23    have had it on me.  I wish I would've stuck it in my
24    crotch.
25                    MR. RADNER:  Just try to answer.

Page 74

1                    THE WITNESS:  I'm sorry.

2   Q    (By Ms. Forbush):  Is that where you typically carry

3        your driver's license?

4   A    No, but they tend to not want it once it's there.

5   Q    How do you know that?

6   A    Because I've seen it on videos before.

7   Q    But you've never done that?

8   A    No.  I never had the opportunity to do it yet.

9   Q    But you plan on doing it in the future?

10  A    Yeah, I may.

11  Q    You don't know who handcuffed you, right?

12  A    No.

13  Q    And were you injured when you were handcuffed?

14  A    Just the pain in my shoulder and that when they, you

15       know, turned my arm.

16  Q    Did you tell them you were in pain?

17  A    No.  I told them after they had taken the handcuffs

18       off and that that, you know, putting my hand on top of

19       my head and bringing it back down gave me some dis-

20       comfort.

21  Q    You said that out loud?

22  A    Yeah.  I think I said something like, "My shoulder's

23       screwed up," you know, and probably winced in pain,

24       you know.

25  Q    Did you ask for any medical treatment?

Page  75

1   A    No.  I was trying to get away.

2   Q    How long were you handcuffed?

3   A    Oh, probably less than 10 minutes.

4   Q    As I recall, you were handcuffed, and you were placed

5        in the rear of the patrol vehicle, correct?

6   A    Yes.

7   Q    And you were asked if you needed some air, and the

8        window was rolled down, correct?

9   A    Yep.

10  Q    And within a matter of a few minutes you were removed

11       from the vehicle, --

12  A    No.

13  Q    -- you were uncuffed --

14  A    No.

15  Q    -- and you were given a citation.

16  A    No.  They wrote the -- they were having problems

17       writing the citation out and that.  The officer's

18       vehicle I was sitting in, he put the windows up and

19       indicated that he was all nice and cool up in the

20       front, and I was like, I was hoping that was caught on

21       audio and that.

22  Q    Who was that?  What officer was that?

23  A    I'm not really sure what officer that was, but he's

24       the one in Stubberd's case too.  He screws up and

25       says, "You can see everything we can see, and we can

1  see everything you can see."  And he was talking about

2  a recorder.  It's really funny, the way that he said

3  it.  But it was that guy.  I can't think of his  -- I

4  don't know his name.

5  Q  When did he make this statement, "You can see whatever

6  we can see"?

7  A  That was in that Stubberd's case or whatever, the one

8  where they broke out his window and stuff.

9  Q  The autistic guy?

10  A  Yes, yes.

11  Q  And so, you've been given a citation, and you're

12  allowed to leave?

13  A  Yes.

14  Q  So, you're detained for less than 10 minutes?

15  A  Yeah, but they stole my camera.

16  Q  Who stole your camera?

17  A  I believe Chief Settles took it.

18  Q  Where did he take it?

19  A  Into the police station.

20  Q  Did you ever get it back?

21  A  The next day.  Well, when I went into the police

22  station and asked him -- told him I wanted my camera

23  back, he said that he was going to hold on to it.  He

24  said he was going to check into getting a warrant to

25  see what's on it.

1    Q    Does your video show the white car illegally parked?

2    A    I believe you can see it when I walked by it.

3         Because, like I said, I got a video from starting down

4         at the far end of the building there and getting a

5         shot of the front door, then moving forward a little

6         bit and getting a shot of the sign and the sally port,

7         and then continuing on down the sidewalk.  I believe

8         that car, that vehicle, is in the video when I'm

9         shooting from the far distance.

10   Q    Well, that was probably a focal point of your video,

11        right?  Because that was the whole reason you were

12        taking --

13   A    Not this vehicle.  Not this vehicle.  The police

14        vehicle that was parked further down in the handi-

15        capped zone facing the wrong direction.

16                       There's one or two handicapped

17        parking spots in front of the police station, and he

18        pulled in right there facing the wrong way on the

19        wrong side of the road, like this vehicle is, but in a

20        handicapped spot.

21   Q    So, you only cared --

22   A    That's why I wanted pictures of that.  I wanted

23        pictures of that badly, but I couldn't get it.

24   Q    Why did you want it so badly?

25   A    Just so that I can say they can and we can't.  I mean,

Page 78

1          you know, the privileged, the privileged, you know,

2          that's why.

3    Q    Because they're sovereign citizens?

4    A    Yes.  They're privileged.  They find they've done

5          nothing wrong.

6    Q    All right.  But the fact that someone else's vehicle

7          was parked illegally wasn't of great interest to you?

8    A    He's the common man.  Let him.  He can do what he

9          wants.  You know, it's none of my business.  But, you

10         know, what they're doing wrong is my business.

11   Q    You don't want to mess with the common man?

12   A    He's a free man.  He can do what he wants.

13   Q    Like you?

14   A    I imagine, yes.

15   Q    All right.  And you've provided us with some photo-

16         graphs.  I'm going to show you Exhibit No. 1 and ask

17         if you can tell me what's depicted in that photograph?

18   A    Yep, that's my arm and the bruises.

19   Q    What arm is it?

20   A    It's my right arm.

21   Q    And who took that photo?

22   A    I took that photo.

23   Q    What did you take the photo with?

24   A    With my camera phone.

25   Q    Your cellphone?

Page  79

1   A   Yes.

2   Q   Who pays your cellphone bill?

3   A   I do.

4   Q   Do you still have a cellphone?

5   A   Yes, I do.

6   Q   Who's your carrier?

7   A   Boost.

8   Q   Boost Mobile?

9   A   Yep.

10  Q   How long have you had a cellphone?

11  A   Oh, whew.  Probably two months now, three months.

12  Q   All right.  But you had this in June of 2018.  How

13      long had you had the phone then?

14  A   It might've been my other phone, or it might've been

15      my tablet.  It could've been this tablet here.  I'm

16      not really sure.

17  Q   How long --

18  A   They're both Androids or whatever.  Huh?

19  Q   How long have you owned the tablet?

20  A   This tablet?  This one, probably about two years now,

21      and then the one prior to it, three or four years.

22  Q   And what date was it that you took those photographs?

23      That photograph, I'm sorry.

24  A   It was three days later, four days later.  The 17th, I

25      believe.

Page 80

1    Q    Was anyone present when you took the photograph?

2    A    Nope.

3    Q    I'm going to show you what's been marked as Exhibit

4         No. 2.  Can you tell me what's shown in that photo-

5         graph?

6    A    Yep, another shot of my arm.

7    Q    Same arm?

8    A    Yep.

9    Q    Same bruise?

10   A    Yep.

11   Q    What date did you take that picture?

12   A    The same time.

13   Q    Same date?

14   A    Yep, same date.

15   Q    Any other photographs that you took related to this

16        incident that you haven't produced?

17   A    There might be several different shots of this, but --

18   Q    So, why didn't you produce those?

19   A    Because I just took as many as I could, and some of

20        them didn't come out right, you know, you couldn't

21        see.

22   Q    These are your two best pictures?

23   A    These are the ones somebody chose here, I guess, that

24        I had sent them.

25   Q    Did you send your attorney more than two photographs?

Page 81

1    A    I cannot recall.  I don't recall.

2    Q    But you have more than two photographs?

3    A    Yeah.  I probably took eight to 10 of them, you know.

4         Because of the lighting and that, it's hard to -- it

5         was hard to see.

6    Q    What did you do with those other photographs?

7    A    They're still in the file.

8                        MS. FORBUSH:  All right.  Let's take

9         a short break.

10                       (Recess taken.)

11                       MS. FORBUSH:  All set?

12                       THE WITNESS:  Yes.

13   Q    (Continuing):  At any time during this encounter did

14        anybody tell you to stop filming?

15   A    No.

16   Q    You said that they stole your camera.  Did you ever

17        get it back?

18   A    Yeah.  I got it back the next morning.

19   Q    After you were given your citation what did you do?

20   A    I went home.

21   Q    Did you come back to the police department that day?

22   A    Oh, yeah.  I went back -- went home, got my other

23        camera -- well, at first -- all right.  After they

24        released me from the vehicle I walked into the police

25        station, and I requested a complaint form.

Page 82

1          And at that point I had talked --
2     Chief Settles had come out the door -- just opened the
3     door up and told me he was going to hold on to my
4     camera and check into getting a warrant to see what
5     was on it.  And I told him, you know, "You're supposed
6     to just give it back to me."  And he said he was going
7     to see if he can check into getting a warrant and
8     that.
9          So, then next day -- well, I went --
10    that happened, went back home, got a phone, video
11    recorded in the lobby there.
12 Q   All right.  Let me back up a little bit here.
13          You received your citation.  You
14    went into the police department.  You requested a
15    complaint form.  Were you given a complaint form?
16 A   I can't remember if I got complaint forms the first
17    time around or not.
18          But then I went home, because I
19    needed some way to document what was going on.  So, I
20    went home and got another camera.
21 Q   You got a cellphone?
22 A   Yeah.  I went home, got a cellphone or a tablet.  I
23    don't remember exactly which one it was.
24 Q   Did you tell your mom and stepdad what had happened?
25 A   I don't know if I had told them exactly what had

1    happened yet.

2    Q    Did you tell your wife what happened?

3    A    Yeah.  She knew something was up, just by the way I

4         came and left.

5    Q    Did she drive you up to the police department?

6    A    No, no.

7    Q    She didn't come with you to the police department?

8    A    No, no, no.  It's only two-tenths of a mile.

9    Q    All right.  So, you went home, got either your

10        cellphone or your tablet, and you came back and went

11        into the lobby?

12   A    Yeah.

13   Q    So, what did you do in the lobby?

14   A    I was video recording in the lobby.

15   Q    Well, what were you recording?  I don't understand.

16   A    Well, the clock and stuff, so it's documented, the

17        times and stuff.

18   Q    Okay.  Did you talk to anybody while you were in the

19        lobby?

20   A    Well, I talked to this officer here.  He gave me

21        another copy of the ticket I had already received.

22   Q    Did you ask for another copy?

23   A    No, no.  He just presented it to me.

24   Q    All right.  Did he say anything to you?

25   A    That, "Here's your copy."  And I said, "Well, I

Page 84

1       already got a copy."  And he wanted that one back, and

2       I had already put it in my pocket, so it's mine.

3                       And he complained about me video-

4       taping in there.

5    Q   Did he tell you to stop?

6    A   No.  He was behind the counter at the time, and then

7       he said, "Now he's videotaping in here."  And he was

8       in his uniform at that time too.

9    Q   Okay.  Did anything happen while you were videoing,

10      other than the discussion you told me about?

11   A   No, just waiting to get my camera back, and apparently

12      they decided they weren't going to give it back.

13   Q   Who did you speak to about your camera at that point?

14   A   Some of the officers in there, and they just acted

15      like they didn't know what I was talking about.

16   Q   All right.  So, then you returned the next day?

17   A   I went to the courthouse the next day.

18   Q   Which courthouse did you go to?

19   A   Romulus Courthouse, and I wanted to speak with one of

20      the judges about getting my camera back.

21   Q   Did you take your camera phone with you or your

22      tablet?

23   A   No.  At that time they don't allow them into the

24      common area of the courthouse anymore.

25   Q   So, then what did you do?

Page 85

1    A    Well, I went into the courthouse, and I talked to

2         Judge Oakley.  He told me he didn't work for me.  He

3         doesn't work for the people.

4    Q    Is that what he said?

5    A    Yeah, that's what he said.

6    Q    "I don't work for the common man"?

7    A    He works for the state.  He works for the state.  And

8         I said, "Well, the state is the people," and he didn't

9         want to hear it.  And he told me, I think, "Go see the

10        city manager" or whatever.  So, I went and seen the

11        city manager.  The city manager knew all, everything

12        that was going on.  She said, "Your camera's at the

13        police station.  You can go pick it up," so I went to

14        the police station and retrieved my camera.

15   Q    What time was that?

16   A    Oh, probably nine, nine o'clock in the morning, some-

17        where around in there.

18   Q    Did you record your interaction with the city manager?

19   A    No, I couldn't.  They had my camera.

20   Q    Well, you had your cellphone or your tablet with you

21        that you used --

22   A    Right, right.

23   Q    -- back in the lobby.  Why didn't you record the city

24        manager?

25   A    I just didn't.  I was anxious to get my camera back

Page 86

1           and --

2     Q     All right.  And you got your camera back?

3     A     -- get the footage off of it.

4                        Yes, I did.

5     Q     And nobody erased your footage that you had?

6     A     No.  Somebody made a little one-second recording, like

7           they were messing with the camera.  It was just a

8           brief, you know -- it clicked on and clicked off.

9           One, you know, very short clip, other than the other

10          videos prior to it, which were of the police station.

11                       Like I said, I only had the camera

12          three or four days.  There's not very much in front of

13          it.  It's still intact, the same way it was.  Since

14          then I've made recordings, but I have such big a card

15          on it that it can, you know, record.

16    Q     All right.  And you said that your tripod was damaged?

17    A     Yes.

18    Q     Did you get your tripod back?

19    A     Yes.

20    Q     What was the damage to it?

21    A     It won't stay level now.  You can't -- you know, on

22          the adjustment it's just like tilted a couple degrees,

23          and you can't get it to stay level, and it flops, you

24          know, it wiggles now.  Before it was solid.

25    Q     Do you still have the same tripod?

Page 87

1    A    I have the tripod, but I since use it for something

2         else now.

3    Q    What do you use it for?

4    A    A projector.

5    Q    So, it works on your projector, but it doesn't work on

6         your camera?

7    A    Well, the projector, when you're projecting onto the

8         wall or whatever, you can make adjustments and like

9         stick something under one of the legs or whatever to

10        straighten it out.

11   Q    Are there any court orders against you for child

12        support?

13   A    Nope.

14   Q    Your spouse has never sought child support from you?

15   A    Nope.

16   Q    You were telling me about this.  After you received

17        the settlement money from the Turner lawsuit --

18   A    Uh-huh.

19   Q    -- that you had fun with your money, and you went on a

20        cross-country trip --

21   A    Yep.

22   Q    -- to casinos.

23   A    Well, I stopped at casinos along the way.

24   Q    Tell me what states you visited.

25   A    Oh, boy.  Indiana, Illinois, Missouri, Oklahoma,

Page 88

1        Texas, New Mexico, Arizona -- that's probably about
2        the trip across right there -- oh, Colorado,
3        California.
4    Q   Any other states you stopped in?
5    A   Ohio.
6    Q   Did you stop to see your son on your cross-country
7        trip?
8    A   I was going to, but my wife was in a mood, and I
9        didn't end up stopping.
10   Q   She didn't want you to come over?
11   A   She -- like I said, it's a deep story.  She has
12       issues.  She has, you know, I think psychological
13       issues, but she won't seek help for it.
14   Q   All right.  So, when you went to all these states --
15       Indiana, Illinois, Ohio, Missouri, Oklahoma, Texas,
16       New Mexico, Arizona, Colorado, California -- where did
17       you stay?
18   A   I don't know.  Hotels occasionally.
19   Q   Well, if you didn't stay in a hotel where did you
20       stay?  Did you stay with friends or --
21   A   Car, car camping.
22   Q   What car were you in?
23   A   Well, I got the van and came back.  I flew out there
24       -- no, I drove out there.  I drove my mom out there.
25       I've done it so many times.  She stays out there in

Page 89

1            the winter.

2    Q    Your mom?

3    A    Yes.

4    Q    In Arizona?

5    A    Yes.

6    Q    That's where she sells real estate?

7    A    Yes.

8    Q    Does she sell real estate here in Michigan?

9    A    No.  She used to.

10   Q    So, when you say you did this cross-country trip and

11        you went car camping, what's car camping?

12                        MR. RADNER:  Objection.  This is

13        completely irrelevant.

14   A    It's when you sleep in the vehicle.

15   Q    (By Ms. Forbush):  So, you have this disability that

16        doesn't allow you to work, but you can -- you have a

17        bad back, a bad neck and a bad shoulder, but you can

18        sleep in a car, right?

19                        MR. RADNER:  Objection, asked and

20        answered.

21   Q    (By Ms. Forbush):  Right?

22                        MR. RADNER:  It's a mischaracter-

23        ization.

24   A    I don't know.  If you can get to sleep, yes.

25   Q    (By Ms. Forbush):  While you were taking this cross-

Page 90

1          country trip did you go to the Grand Canyon?

2    A     No.

3    Q     Did you do any hiking?

4    A     No.

5    Q     Do any sightseeing?

6    A     No.

7    Q     Just went to casinos?

8    A     A couple casinos, yeah.

9    Q     Other than going to casinos, staying at a hotel once

10         in a while and car camping, what else did you do on

11         this cross-country trip?

12                        MR. RADNER:  Same objection.

13   A     I went to Mexico.

14   Q     (By Ms. Forbush):  What did you do in Mexico?

15   A     Just sightsee.  You know, there's a little town right

16         there across the border.

17                        Seen the dentist; that's about it.

18   Q     Buy any drugs, --

19   A     No.

20   Q     -- anything like that?

21   A     No.  Videotaped a guy getting arrested.

22   Q     For your footage?

23   A     In Mexico.  Boy, are they mean.  You guys would really

24         enjoy it.  (Laughing.)

25   Q     You're laughing out loud?  You thought it was funny?

Page 91

1    A    No.  I said they would really enjoy it, what they can

2         get away with there.

3    Q    Who are you referring to as "they"?

4    A    The police officers.

5    Q    Let me show you what I've had marked as Deposition

6         Exhibit No. 7, which are your Answers to Interroga-

7         tories.

8    A    Uh-huh.

9    Q    I want to focus your attention to page 12 of Exhibit

10        7.  Is that your signature?

11   A    Yes.

12   Q    And I assume that when you signed that document you

13        were indicating that your answers were truthful and

14        accurate to the best of your knowledge and informa-

15        tion.

16   A    Yes.

17   Q    And you read the answers, and you thought they were

18        accurate, correct?

19   A    Yes.

20   Q    Since this incident and the return of your camera and

21        whatnot, have you had any other contact with the

22        Romulus Police Department that you haven't told me

23        about?

24   A    Not that I can think of, no.

25   Q    Did you ever file an official citizen complaint

1          related to this incident?

2     A    No.

3     Q    Why not?

4     A    Because, like I said, they will find nothing was done

5          wrong.  It's pointless.

6     Q    Have you ever filed a citizen complaint against the

7          Romulus Police Department?

8     A    Yes, Turner.

9     Q    Have you filed citizen complaints against any other

10         departments?

11    A    Westland.

12    Q    When was that?  Well, how many times?

13    A    One, for the jaywalking ticket.

14    Q    And what happened with that citizen complaint?

15    A    They found me guilty, so there was no reason for them

16         to investigate any further.

17    Q    Do you know of anyone who witnessed this incident at

18         the Romulus Police Department on June 14th, 2018,

19         other than police officers?

20    A    There was a lady in a dayglow green shirt.  She

21         happened to be videotaping it.

22    Q    Who is "she"?

23    A    I have no idea.

24    Q    Where was she?

25    A    She was in the police lot.

Page 93

1  Q    And she videotaped what?

2  A    The interaction between Chief Settles and the other

3       officer and me.

4  Q    How do you know she was videotaping?

5  A    You can see her videoing.

6  Q    Did she have a cellphone?

7  A    Yes.

8  Q    How far away from you was she?

9  A    She was where the altercation started.  You know, she

10      was in that position from where I had retreated, and

11      she was on the sidewalk.

12 Q    What was she, a city employee, or who was she?

13 A    I have no clue.  Nobody will tell me who she is.  I'm

14      sure they know who she is.

15 Q    Is she black?  Is she white?

16 A    A black lady, yes.

17 Q    How old was she?

18 A    An older lady.  Probably in her 60s.

19 Q    Did she say anything?

20 A    No.  She never got close enough.

21 Q    Have you ever seen her since then?

22 A    No.

23              MS. FORBUSH:  I don't have any other

24      questions.

25

1                        EXAMINATION

2      BY MR. RADNER:

3      Q     I have one question.

4      A     Yes, sir.

5      Q     This lady who was recording you, was she an officer?

6      A     That, I would not know.  She had a dayglow green shirt

7            on, you know, the fluorescent, bright color.  I don't

8            know who she is.

9      Q     Did you see her interacting with the other police

10           officers?

11     A     No.  I seen her interacting with -- well, I thought --

12           I don't know.  It was prior to me getting there, and

13           all I seen was Chief Settles riding a bicycle away

14           from her.

15     Q     Did you notice if the police officers noticed her?

16     A     Well, obviously they know who she is.  She was in the

17           lot.  I mean, she was way in the lot of the police

18           department.

19     Q     So, she was in that restricted area?

20     A     Yes, yes.

21     Q     That's where she was recording from?

22     A     No.  See, what happened is, when the confrontation

23           started happening, she was watching.  And she walked

24           over to a certain point in the parking lot, and then

25           she was like waving somebody over like, "Come on, come

Page 95

1      on, come on.  Look, something's happening here.  Come

2      on."  And when we were on the outside, you know, on

3      the outside, when they got to the outside, then she

4      came around the corner; that's when she pulled out her

5      cellphone, I imagine it was, and started videotaping

6      it as we were, you know, walking down the sidewalk.

7      Her and that other lady that was in the striped shirt

8      were discussing something, and that's when she, you

9      know, pulled out her camera.

10   Q  She was discussing something with someone with a

11      striped shirt?

12   A  The black lady with the blue and gray striped shirt.

13      I think she's a detective there.

14   Q  She also came from the restricted area?

15   A  She was the one in the vehicle that was pulling in

16      that beeped at me.

17   Q  Okay.  So, this lady who was recording you spoke to

18      that lady who was pulling in that beeped at you?

19   A  Right, right.  The lady, she had collected the bike

20      from where Chief Settles kept it -- left it blocking

21      the gate and moved it over by the keypad thing, behind

22      the keypad, from what I can see in the video.  And

23      then she was talking to the lady with the striped

24      shirt, and that's when she pulled out her phone and

25      started recording as she was walking up.

Page 96

1    Q    Did you try to get her information from the police

2         station?

3    A    I had mentioned it when I went in, that I wanted to

4         know who the lady in the dayglow shirt was.  You know,

5         she had a video I would like copies of, if I could

6         possibly get it.  I don't know if she's a city

7         employee or not, so I don't know -- it's private.  You

8         know, it's hers, it's hers.

9    Q    Who did you ask at the police station?

10   A    The records clerk.

11   Q    Did you ask Chief Settles?

12   A    No, I did not, no.

13                    MR. RADNER:  I don't have any other

14        questions.

15                    MS. FORBUSH:  No questions.

16              (Deposition concluded at 10:37 a.m.)

17                          -  -  -

18

19

20

21

22

23

24

25

STATE OF MICHIGAN )
                  )  ss.
COUNTY  OF  WAYNE )

            I, Susan L. Marek, CSR-2692, a
Notary Public duly commissioned and qualified within and
for the County of Wayne, State of Michigan, do hereby
certify that I conducted the examination of the deponent,
BILLY GENE NORRIS, II, in the foregoing deposition; that
prior to the taking of said deposition the said deponent
was duly sworn to tell the truth, the whole truth and
nothing but the truth; that he was examined upon his oath;
that his examination was reduced to typewritten form under
my supervision; that the deposition is a full, true and
correct transcript of my stenographic notes of the
testimony of said deponent.

            I further certify that I am not a
relative, employee, attorney or counsel of any of the
parties, or a relative or employee of such attorney or
counsel, nor am I financially interested in this action.

            I further certify that no request
was made that the deposition be submitted to said deponent
for examination and correction or that he sign the same.

            IN WITNESS WHEREOF, I have hereunto
set my hand this 9th day of September, 2019.


            Susan L. Marek, CSR-2692, Notary Public
            Wayne County, State of Michigan
            Acting in Oakland County
            My commission expires:  10-23-25